## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BERNADETTE TAYLOR LOCKETT, | ) | 3:20-CV-00191 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TARGET CORPORATION, | ) | |
| *Defendant*. | ) | November 22, 2022 |

## <u>RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

Plaintiff Bernadette Taylor Lockett, proceeding *pro se*, has brought this action against Defendant Target Corporation, alleging that Defendant violated her rights by creating a hostile work environment, discriminating against her on the basis of her race and sex, and retaliating against her when she complained of the discrimination she was experiencing. Following earlier motion practice in this action, four claims remain in Plaintiff's amended complaint: race-based hostile work environment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-2 ("Title VII"); constructive discharge in violation of Title VII; retaliation in violation of § 1981 and Title VII; and race discrimination in violation of Title VII.

Defendant seeks summary judgment on each remaining count of the amended complaint, claiming that there are no genuine issues of material fact that preclude judgment in its favor as a matter of law. Plaintiff argues that she has raised sufficient issues of material fact to withstand summary judgment. For the reasons described below, the Court agrees with Defendant that it is entitled to summary judgment with respect to Plaintiff's constructive discharge and retaliation claims. The Court agrees with Plaintiff, however, that genuine issues of material fact remain with

respect to Plaintiff's hostile work environment and discrimination claims. Accordingly, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.      FACTUAL BACKGROUND

Unless otherwise noted herein, the parties do not dispute the following facts.[1]  Plaintiff is an African American woman who worked for Defendant, a retail establishment, from 2006 until 2008, and again from 2016 until 2017.  Answer, ECF No. 35, ¶¶ 12, 2–4, 38; Pl.'s Resp. to Def.'s L. R. 56(a)1 St., ECF No. 86, ¶ 12.  As relevant here, in October of 2016, Plaintiff was hired to work as a seasonal Flow Team Member for Defendant.  Before Defendant hired her, Plaintiff participated in an interview with Defendant's Executive Team Leader for Logistics, Filipe Nunes. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 4.  Although Plaintiff contends that Defendant's Logistics Team Leader, Courtney Hill, interviewed her as well, the parties do not appear to dispute that Nunes ultimately made the decision to hire Plaintiff for the seasonal Flow Team Member position. *Id.* ¶ 14.  While interviewing her for the position, Nunes discussed with Plaintiff whether she might be interested in another position with Defendant after her seasonal obligation was fulfilled.  *Id.* ¶ 15.  The parties agree that the other position Nunes referenced during the interview was the position of "Receiver."  *Id.* ¶ 15; ECF No. 86 at 1.

---

[1] Defendant asserts that Plaintiff has not followed Local Rule of Civil Procedure 56 by failing to submit a Local Rule 56(a)2 statement, attempting to "add irrelevant clarification," and failing to cite to admissible, relevant evidence to support her denials of facts provided in Defendant's L. R. 56(a)1 Statement.  ECF No. 99 at 1–3.  Defendant has not pointed the Court to specific examples of these deficiencies, and it appears that Plaintiff has largely cited to evidence in contesting certain facts as disputed, even if her response to Defendant's L. R. 56(a)1 statement was not technically titled as an L. R. 56(a)2 statement.  Because accepting Defendant's argument would not change the outcome of the Court's ruling, the Court will decline to decide whether this argument has merit.  The Court agrees with Defendant, however, that Plaintiff's failure to authenticate text messages, pictures, newspaper articles, and recordings of Connecticut Commission on Human Rights and Opportunities ("CHRO") proceedings that were attached to her opposition renders these items inadmissible for purposes of summary judgment.  *See Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) ("In ruling on a motion for summary judgment, the district court may rely on 'any material that would be admissible' at a trial." (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)); Fed. R. Civ. P. 56(c)(2).

In February or April of 2017, Nunes spoke with Plaintiff about the Receiver position again, and Plaintiff thereafter trained for the position. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶¶ 19–20. At some point in 2017, another employee, John Sanders, who is Caucasian, also trained for the position. *Id.* ¶ 22. In August of 2017, Plaintiff learned that Sanders had been selected for the Receiver position. *Id.* ¶ 24. Within days of learning about this decision, she questioned Hill about it. Lockett Depo., ECF No. 78-3, at 72:1–74:16. Notably, at the time Sanders was promoted to Receiver, he had a corrective action in his file stating that he had failed to call in or report to work for a scheduled shift and that, as a result, he was "ineligible for transfer or promotion" between May 26, 2017, and November 26, 2017. Ex. C to Pl.'s Opp'n, ECF No. 86-3, at 2. Defendant does not dispute the existence of the corrective action but has instead submitted an affidavit from Nunes averring that he either was "unaware" or "forgot" that Sanders had any corrective actions in his file when Sanders was promoted. Ex. D to Def.'s Mot. ("Nunes Aff."), ECF No. 78-2, ¶ 8.

The parties hotly dispute the reasons why Sanders, rather than Plaintiff, was selected for the Receiver position. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 23. Plaintiff contends that Sanders was selected because he threatened to quit if he was not selected, because he coached Hill's football team, and because Plaintiff is African American, while Sanders is Caucasian. *Id.* By contrast, Defendant contends that Nunes selected Sanders for the position because Sanders had prior receiving experience and fewer attendance issues than Plaintiff. *Id.* ¶ 25.

On September 20, 2017, Plaintiff gave notice that she would be resigning from her employment for Defendant, and that her last workday would be October 13, 2017. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 26. Plaintiff testified that her resignation was precipitated, at least in part, by the fact that she was not selected for the Receiver position. Lockett Depo. at 157:15–158:21; *see* Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 27. Specifically, Plaintiff testified that she felt Nunes

3

had lied to her by promising her the position and then giving it to Sanders.  Lockett Depo. at 157:15–158:21, 161:16–161:19.

On October 9, 2017, after she had given her notice of resignation and shortly before her last day working for Defendant, Plaintiff sent a letter to Defendant's Chief Executive Officer, Brian Cornell.  Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 28; Ex. J to Def.'s Mot., ECF No. 78-3, at 156–57.  In her letter, Plaintiff stated that she had been offered the Receiver position in January or February of 2017, and was asked to remain silent about the offer until she was transitioned into the position. Ex. J to Def.'s Mot. at 156.  Plaintiff further claimed that, based on the representations that she would be selected for the Receiver position, she turned down one employment opportunity with a school district and did not apply to another position in human resources with Defendant. *Id.*  According to Plaintiff's letter, Sanders informed her several weeks after she had been offered the Receiver position that he, too, had been offered the position.  *Id.* at 156.  Plaintiff's letter further stated that no one had told her why Sanders, a Caucasian male, was selected for the position instead of her, *id.* at 156–57; Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶¶ 29–30, that she felt disrespected while working for Defendant, and that "cronyism" and "veiled racism" were present at Defendant's Waterbury store, Ex. J to Def.'s Mot. at 157.

On October 11, 2017, Plaintiff wrote to Cornell again, this time via email.  Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 31; Ex. K to Def.'s Mot., ECF No. 78-4, at 2.  Plaintiff's email stated that, although she believed the letter she sent to Cornell had already addressed her reasons for resigning from her employment for Defendant, she wished to share other "recent occurrences."  Ex. K to Def.'s Mot. at 2.  Plaintiff explained that a team leader had used the word "negro" to address an African American male over a walkie talkie; that a sign portraying the word "spook" was displayed—with a Caucasian team leader's knowledge—in a place where African Americans

worked; and that a Caucasian female with a history of recording hours that she did not actually work had slept for two hours on the floor of a team leader's office without any repercussions. *Id.* Plaintiff concluded her email by stating that these activities were not consistent with the policies and procedures in Defendant's handbook, and that someone might want to address the "corruption" and "civil rights violations" occurring in Defendant's Waterbury store. *Id.*

Upon receipt of Plaintiff's October 11, 2017, email, Defendant opened a human resources investigation with respect to Plaintiff's allegations. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 33. On October 12, 2017, Defendant's Senior Employee Relations Consultant, Heather Simonett, spoke to Plaintiff regarding her allegations. *Id.* ¶ 34. During her call with Simonett, Plaintiff raised a new concern about music Sanders and other team members were playing in the backroom of Defendant's Waterbury store. *Id.* ¶ 51. On October 15, 2017, after her last day with Defendant, Plaintiff sent an email to Simonett, in which she described the music as having "profane and misogynist laced lyrics." *Id.* ¶ 52; Ex. L to Def.'s Mot., ECF No. 78-4, at 10. In her email, Plaintiff also stated that Hill and Aimee Nunez, Defendant's Executive Team Leader for Human Resources, did not speak to her on her final day of employment, and that she assumed that Hill and Nunez knew that Plaintiff had "lodged a complaint." Ex. L to Def.'s Mot. at 10. Plaintiff indicated that she "didn't leave [her employment with Defendant] with a bad taste in [her] mouth" and was "in no way thinned skinned," but that she left "having no respect for [Nunes] and a great sadness and lack of respect for [Hill] and [Nunez]." *Id.* Plaintiff attached to her email a recording of the music that was being played in the backroom, and she stated that Hill and multiple other employees, including the "back room team lead," were present while the music was being played. *Id.* In her deposition testimony, Plaintiff also claimed that, on her last day, she overheard Sanders complaining about being called a racist. Lockett Depo. at 153:20–154:18.

Defendant's human resources investigation regarding the allegations in Plaintiff's October 11, 2017, email and her subsequent conversation with Simonett concluded on November 20, 2017, approximately five weeks after Plaintiff's final day of employment for Defendant.  Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 33; *see* Ex. L. to Def.'s Mot. at 4.  The investigation, as well as discovery in this action, have yielded the following information regarding Plaintiff's allegations.  First, Hill and another employee, Armani Stevens, had referred to each other as "whitey" and "my negro," respectively, over walkie talkies while at work.  Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶¶ 43–44. Plaintiff did not hear these comments personally but rather was told about them by another team member.  *Id.* ¶ 43.  Defendant ultimately terminated Hill as a result of the investigation for violating company policy.  *Id.* ¶ 45.  Second, the employee who slept in a team leader's office suffered from narcolepsy, and Defendant found that the employee's timekeeping records were not abnormal; Plaintiff disputes the support for both of these findings.  *Id.* ¶¶ 46, 48.  Third, the "spook" sign that Plaintiff referenced was purportedly displayed in the backroom of Defendant's Waterbury store as a joke between Sanders and Stevens.  *Id.* ¶ 56.  On or about October 16, 2017, Defendant placed Sanders on a final warning as a result of its investigation.  *Id.* ¶ 59.  Fourth and finally, Nunes avers that, in or around October of 2017, with the exact date unspecified, he instructed employees that they could no longer listen to music in the backroom.  Nunes Aff. ¶ 13.

In addition to the allegations discussed above, Plaintiff provided testimony that on her final day of employment for Defendant, a banana was placed at the station where she was working. Lockett Depo. at 197:18–198:25.  Specifically, Plaintiff testified that, on October 13, 2017, she was working at the "ship-to-store" workstation in the backroom at Defendant's Waterbury store. *Id.*  At some point during the day, Plaintiff left the workstation to take a bathroom break and, when she returned, she found a banana at the workstation.  *Id.*  Although the "ship-to-store" workstation

was a shared work area that was used by more than one team member, Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 62, Plaintiff testified that she was the only one using the workstation around the time the banana was placed there, Lockett Depo. at 199:8–199:14.  Plaintiff does not dispute that she does not know who placed the banana at the workstation or why they put it there, Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 64, but she testified that employees were not allowed to have food or drinks in the backroom and that she had never seen anyone bring food to the area, Lockett Depo. at 199:15–200:10.

## II.    PROCEDURAL BACKGROUND

Plaintiff commenced this action in February of 2020, ECF No. 1, and subsequently amended her complaint in April of 2020, Am. Compl., ECF No. 20.  Defendant responded to Plaintiff's amended complaint by filing a motion to dismiss, ECF No. 25, which the Court (Meyer, J.) granted in part and denied in part, ECF No. 31.  While there were originally seven claims in Plaintiff's amended complaint, only the following four claims survived the Court's ruling on Defendant's motion to dismiss:  Count One, race-based hostile work environment in violation of § 1981 and Title VII; Count Three, retaliation in violation of § 1981 and Title VII; Count Four, constructive discharge in violation of Title VII; and Count Five, race discrimination (disparate treatment) in violation of Title VII.  *See id.*  After discovery closed in November of 2021, this case was transferred to the undersigned, *see* ECF Nos. 75, 76, and Defendant thereafter moved for summary judgment on all remaining counts of the amended complaint, ECF No. 78.

## III.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  With respect to materiality, a fact is

"material" only if a dispute over it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*   In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.   It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).   The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249.   If the non-movant fails "to make a sufficient showing on an essential element of [their]

case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants). This principle applies where the party opposing summary judgment is proceeding *pro se*, though a party's status as a *pro se* litigant does not relieve that party "from the usual requirements of summary judgment." *Garibaldi v. Anixter, Inc.*, 492 F. Supp. 2d 290, 292 (W.D.N.Y. 2007) (citing *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999)).

## IV.   COUNT ONE:  HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AND SECTION 1981

The Court first denies Defendant's motion insofar as it requests summary judgment on Count One.  In particular, the Court finds that genuine issues of material fact remain with respect to whether Plaintiff was subjected to a hostile work environment because of her race.

### A.   Legal Standard

A hostile work environment exists when the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  A plaintiff may pursue a hostile work environment claim under either Title VII or 42

U.S.C. § 1981, which are analyzed under the same standards.[2]  *See Patterson v. Cnty. of Oneida,*

*N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (noting that "most of the standards applicable to the conduct

alleged to constitute hostile work environment in violation of Title VII are also applicable to . . .

employment claims under § 1981").

A hostile work environment claim has both objective and subjective components:  first,

objectively, the conduct complained of must be "severe or pervasive enough that a reasonable

person would find it hostile or abusive"; and second, "the victim must subjectively perceive the

work environment to be abusive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).  In

general, the hostile incidents "must be more than episodic; they must be sufficiently continuous

and concerted in order to be deemed pervasive."  *Alfano*, 294 F.3d at 374.  "Isolated acts, unless

very serious, do not meet the threshold of severity or pervasiveness."  *Id.*  That said, a hostile work

environment claim is necessarily "based on the cumulative effect of individual acts."  *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  In sum, to determine whether Plaintiff

suffered a hostile work environment, the Court must "consider the totality of the circumstances,

including the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  *Littlejohn*, 795 F.3d at 321.

A plaintiff must also show conduct that "creates" the hostile work environment because of

her protected characteristic, such as her race.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.

---

[2] Title VII prohibits employment discrimination on the basis of race, among other characteristics.  42 U.S.C. § 2000e.
The two types of discrimination theories available under Title VII are disparate treatment and hostile work
environment.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  Section 1981 provides, in relevant part, that "[a]ll
persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all
laws . . . as is enjoyed by white citizens."  Section 1981 provides a cause of action against a private employer for race-
based employment discrimination based on a hostile work environment.  *See CBOCS W., Inc. v. Humphries*, 553 U.S.
442, 447 (2008); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir. 2000); *Smith v. Perkin-Elmer
Corp.*, 373 F. Supp. 930, 932 (D. Conn. 1973).

2001); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes.").  Offensive conduct need not be specifically directed at a plaintiff in order to constitute a hostile work environment. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 222–23 (2d Cir. 2004) (noting that, even if offensive conduct by male employees would have occurred regardless of the female plaintiff's presence in the workplace, a jury could still conclude that the plaintiff was subjected to a hostile work environment).

In addition, a plaintiff asserting a hostile work environment claim must demonstrate that "there is a basis for imputing the conduct that created the hostile environment to the employer." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020).  The Second Circuit has recognized two bases for imputing liability to an employer:  "strict vicarious liability if an employer's supervisor has created the hostile environment" and "negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it."  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019).  With respect to strict vicarious liability, an employee is a supervisor only "when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotation marks omitted).  With respect to co-workers' conduct, an employer is liable for a hostile work environment created by a plaintiff's co-worker who is not the plaintiff's supervisor, "only if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate[] remedial action," *McLeod v. RBS Sec. Inc.*, No. 3:12-CV-1596

11

(RNC), 2015 WL 5822591, at *3 (D. Conn. Sept. 30, 2015) (internal quotation marks omitted) (quoting, in part, *Whidbee*, 223 F.3d at 72), or if the employer "failed to provide a reasonable avenue for complaint," *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992) ("a plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it").

B. <u>Discussion</u>

The Court concludes that there are genuine issues of material fact as to Plaintiff's hostile work environment claim that render summary judgment inappropriate. Plaintiff's hostile work environment claim focuses on the following occurrences. First, Plaintiff alleges that, beginning in August of 2017—on the day Defendant promoted Sanders to the Receiver position—and lasting until the day Plaintiff left her employment with Defendant, Sanders and other employees were permitted to play music on a speaker that contained several derogatory terms, including racist and sexist language. ECF No. 94 at 2. Plaintiff alleges that Nunes, her supervisor, did not prevent the music from being played, and that Hill was present when the music was played. *Id.*; Ex. L to Def.'s Mot. at 10. Second, Plaintiff claims that a sign that read "spook," which Plaintiff argues is a derogatory term for African Americans, was placed in an area where Plaintiff and other team members could easily see it. ECF No. 94 at 2. Third, Plaintiff alleges that on her last day of employment for Defendant, she was forced to work alone, witnessed Sanders rant about being labeled a racist, and found a banana at the ship-to-store workstation, where she was stationed that

day.[3]  *Id.* at 3.  In connection with her hostile work environment claim, Plaintiff also generally discusses Defendant's failure to promote her to the Receiver position, microaggressions exhibited by Defendant's Store Team Leader, Kyle Wilhelmy, and the inappropriate language ("my negro" and "whitey") used by Hill and Stevens.

The Court first finds that there are genuine issues of material fact as to whether the conduct Plaintiff complains of was objectively "severe or pervasive enough that a reasonable person would find it hostile or abusive," *see Raspardo*, 770 F.3d at 114.  At the outset, the Court notes that many of the incidents upon which Plaintiff relies—the spook sign, the inappropriate language between Hill and Stevens, and the banana at her workstation—are isolated in nature, and likely would not constitute a hostile work environment, either each standing alone or even in combination.  Even assuming all of these incidents were racially motivated, the Second Circuit has held that, when a plaintiff claims that she was subjected to a hostile work environment based on "racist comments, slurs, and jokes," she must show "more than a few isolated incidents of racial enmity."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted).  In other words, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."  *Id.* (citation omitted) (alteration in original).  Therefore, whether racial slurs or incidents constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs or incidents, "considered cumulatively in order to obtain a realistic view of the work environment."  *Id.* at 110–11 (internal citations and quotation marks omitted).  Setting aside

---

[3] Defendant claims that Plaintiff has failed to exhaust her administrative remedies with respect to the allegation that a banana was placed at the shared workstation where she was working because this allegation was not included in Plaintiff's CHRO charge.  *See* ECF No. 78-1 at 11 n.15.  Title VII, however, "allows for loose pleadings" in an administrative charge and "a complainant need not list every detail of her alleged discriminatory treatment," so long as she "provide[s] sufficient specifics to afford the [commission] a reasonable opportunity to fulfill its obligations to investigate the complaint and attempt to mediate a resolution."  *See Briggs v. N.Y. State Dep't of Transp.*, 233 F. Supp. 2d 367, 376 (N.D.N.Y. 2002).  Here, Defendant does not dispute that Plaintiff otherwise exhausted her hostile work environment claim in her CHRO charge, or that she included her other allegations regarding her hostile work environment claim in that charge.  Accordingly, the Court rejects Defendant's argument.

Plaintiff's evidence of the backroom music, Plaintiff's evidence of other episodic racially offensive conduct—including that Hill and Stevens referred to each other using racially insensitive terms over walkie talkies and that a sign with the word "spook," which Plaintiff argues is a racial epithet, and a banana were displayed and placed, respectively, in her workspace—likely would not be pervasive and severe enough to establish that Plaintiff endured a hostile work environment.

But Plaintiff's evidence concerning the offensive music Sanders and other team members played on speakers in the backroom of Defendant's Waterbury store creates genuine questions of material fact regarding the pervasiveness and severity of the offensive conduct, particularly when considered alongside the other incidents discussed above. Plaintiff has testified—and Defendant does not appear to dispute—that the music contained racist, xenophobic, and misogynistic language. Courts in this circuit have found that, under certain circumstances, a plaintiff's evidence that other employees played racially or sexually offensive music can help to establish that the plaintiff endured a hostile work environment. *See Peterson v. City of Rochester*, No. 06-CV-6003, 2010 WL 1408013, at *7 (W.D.N.Y. Mar. 31, 2010) (denying defendant's motion for summary judgment where, among other things, plaintiff's co-workers "repeatedly playing lewd and racially loaded rap music outside her office door"); *Legg v. Ulster Cnty.*, No. 1:09-CV-550 (FJS), 2022 WL 2526250, at *4 (N.D.N.Y. June 17, 2022) (noting that district court had denied summary judgment based, in part, on evidence that co-workers and supervisors played sexually offensive music).

Here, genuine issues of fact exist as to when employees began playing the offensive music in Defendant's backroom and how often it was played, which are material to the severity and pervasiveness of the hostile conduct Plaintiff alleges. Plaintiff contends Sanders began playing the offensive music on the day he was promoted to the Receiver position. ECF No. 86 at 2.

Additionally, Defendant has submitted evidence of notes Simonett took after a conversation with Plaintiff indicating that Plaintiff reported that the music was "played on a regular basis." ECF No. 78-2 at 26.  But questions of fact remain as to how frequently, and over what period of time, the offensive music was played, which bear on whether Plaintiff suffered a hostile work environment. Accordingly, the Court will decline Defendant's request to grant summary judgment on the ground that Plaintiff's work environment was not objectively hostile.[4]  *See Rasmy*, 952 F.3d at 390 (recognizing that a determination of the "overall severity and pervasiveness of discriminatory conduct" is "bound to raise factual disputes that likely will not be proper for resolution at the summary judgment stage").

Next, genuine disputes of material fact remain with respect to whether Plaintiff subjectively perceived her work environment to be hostile, *see Raspardo*, 770 F.3d at 114.  While Defendant has submitted evidence of Plaintiff's statements that she did not leave her employment for Defendant "with a bad taste in [her] mouth" and that she was "in no way thin-skinned," *see* ECF No. 78-1 at 41 (citing, in part, Lockett Depo. at 159:2–159:10); ECF No. 78-2 at 27, the record also reflects that Plaintiff complained to Simonett about the music being played in the backroom and described the music as "racist," "xenophobic," "profane," "misogynistic," and "violent," ECF No. 78-2 at 27, 66; Lockett Depo. at 149:13–149:19.  Accordingly, a reasonable jury could find that Plaintiff subjectively perceived her work environment to be hostile or abusive, and summary judgment with respect to this issue is unwarranted.

---

[4] Defendant's argument that various employees played different genres of music in the backroom is inapposite.  The issue here is not whether the playing of music, of whatever variety, was inappropriate.  Rather, it is whether the music played over speakers by Sanders and other team members, which Defendant does not dispute contained racist language, including the "n" word, created an abusive working environment for Plaintiff, as an African American employee.

The Court is unconvinced by Defendant's argument that Plaintiff has not shown that any hostility occurred because of her race.  The Court acknowledges that, at oral argument, Plaintiff conceded that she has no evidence to rebut Defendant's representations that the "spook" sign was displayed as a joke between two other employees.[5]  *See* Pl.'s Resp. to Def.'s R. 56(a)1 St. ¶ 56. Plaintiff likewise conceded that she has failed to offer evidence indicating that offensive music was played because of Plaintiff's race, or that the banana was placed at the shared workstation she was using because of her race, *see id.* ¶¶ 62, 64.  But, upon review of the Second Circuit's decisions on this issue, it is clear that Plaintiff does not need to establish precisely that Sanders and the other team members played the music because she is African American, or that the other incidents were directed at Plaintiff because of her race.  Rather, the question is whether the conduct *created an environment* hostile to Plaintiff because she is African American.  *See Brown*, 257 F.3d at 252. Indeed, the Second Circuit has held that a plaintiff can establish a hostile work environment claim even if the offensive conduct is not directed at her and would likely have occurred *irrespective* of the plaintiff's presence in the workplace.  *See Petrosino*, 385 F.3d at 222 ("The fact that much of this offensive material was not directed specifically at Petrosino—indeed, her male co-workers would likely have traded sexual insults every morning and defaced terminal boxes with sexual graffiti regardless of Petrosino's presence in the [Installation and Repairs] department—does not, as a matter of law, preclude a jury from finding that the conduct subjected Petrosino to a hostile work environment based on her sex.").  *See also Schwapp*, 118 F.3d at 111 ("a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment"); *Rasmy*, 952

---

[5] Plaintiff has submitted, as attachments to her opposition to Defendant's motion, a blog post indicating that, in 2010, Defendant pulled a toy called "Spook Drop Parachuters" from its shelves after the toy received criticism, ECF No. 86-3 at 20–21, and a news article discussing why the term "spook" is considered an ethnic slur for African Americans, *id.* at 22–25.  Because these articles appear to constitute inadmissible hearsay, the Court has not considered them in connection with Defendant's pending motion.

F.3d at 389 (noting that "conduct not directly targeted at or spoken to an individual but purposefully taking place in his presence can nevertheless transform his work environment into a hostile or abusive one").

What Plaintiff must show is that the environment was not "equally harsh" for those in a protected class as for those outside of that class. *Brennan*, 192 F.3d at 318. Viewed in the light most favorable to Plaintiff, the record in this case offers support for the proposition that Sanders, a Caucasian employee, and other employees repeatedly played music containing offensive terms, including the "n" word, in Plaintiff's presence. A reasonable jury could find this conduct "more demeaning" of African Americans than of others, even if the music was not specifically directed at Plaintiff because she is African American. *See Petrosino*, 385 F.3d at 222. Additionally, viewing the record as a whole in the light most favorable to Plaintiff, a reasonable jury could find that the employees played the offensive music, placed the spook sign and banana in Plaintiff's workspace, and spoke to each other using racially offensive terms either due to a "general hostility to the presence of" African Americans in the workplace or as circumstantial evidence of discrimination.[6] *See Tassy v. Buttigieg*, 51 F.4th 521, 533 (2d Cir. 2022) (noting that the causal element of a hostile work environment claim may be proven either by direct evidence of race-specific and derogatory terms "as to make it clear that the harasser is motivated by general hostility to the presence of individuals of a particular race in the workplace, or by offering some circumstantial or other basis for inferring that incidents race-neutral on their face were in fact discriminatory" (cleaned up) (quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117–18 (2d Cir. 2010)). Questions about subjective intent—including, here, the motivation of Sanders and other employees in playing the music and engaging in the other activity at issue—

---

[6] Defendant's argument that Sanders has African American members of his family does not evince, as a matter of law, that he was not motivated by hostility in playing the music in the backroom.

"can rarely be decided by summary judgment." *See United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013). Accordingly, the Court will not grant summary judgment on the ground that Plaintiff has not shown that any hostility occurred because of her race.

Finally, the Court is unconvinced by Defendant's argument that there is no basis to impute any racially offensive conduct to Defendant. As noted above, conduct may be imputed to an employer under a theory of strict vicarious liability "if an employer's supervisor has created the hostile environment." *Bentley*, 935 F.3d at 91. First, the Court notes that Hill, who could potentially be considered Plaintiff's supervisor, admitted to using racially offensive terms to refer to Stevens over her walkie talkie. Ex. E to Def.'s Mot. ("Hill Aff."), ECF No. 78-2, at 108 ¶ 5. Plaintiff also asserts, and Hill's affidavit does not deny, that Hill witnessed the offensive music being played by Sanders and others. Ex. L to Def.'s Mot. at 10. While Defendant contends that Hill was not Plaintiff's supervisor, Plaintiff submitted an affidavit from a former Target employee who served as a "Flow Team Lead" that suggests, when viewed in the light most favorable to Plaintiff, that Hill, in her position as "Logistic, Team Lead," *see* ECF No. 78-2 at 107 ¶ 2, would have been responsible for interviewing Plaintiff as a prospective hire, assigning Plaintiff work, disciplining Plaintiff when necessary, setting Plaintiff's schedule, and extending Plaintiff's hours. Ex. E to Pl.'s Opp'n ("Soberany Aff."), ECF No. 87, at 2 ¶¶ 4–6. Accordingly, if Hill was, in fact, Plaintiff's supervisor, it is possible that some of the conduct underlying Plaintiff's hostile work environment claim could be imputed to Defendant under a theory of strict vicarious liability. Genuine issues of material fact remain concerning whether Hill was Plaintiff's supervisor and, if so, whether Hill's conduct can be imputed to Defendant under a strict vicarious liability theory.

Additionally, when the source of the alleged harassment is a co-worker, conduct may be imputed to an employer under a theory of negligence where the plaintiff demonstrates that the

employer "failed to provide a reasonable avenue for complaint" or that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley*, 217 F.3d at 154. Plaintiff alleges that her co-workers, including Sanders and Stevens, were the sources of much of the racially offensive conduct she experienced. *See* Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶¶ 53, 56. Initially, the Court notes that Plaintiff has failed to rebut Defendant's evidence that its anti-harassment policies provided an adequate avenue for Plaintiff to report abusive conduct. *See* Def.'s L. R. 56(a)1 St., ECF No. 78-5, ¶ 1; Ex. K to Def.'s Mot. at 2; *see generally* Ex. A to Def.'s Mot., ECF No. 78-2, at 1–10.

Genuine issues of material fact remain, however, with respect to whether Defendant knew or should have known about the music being played in the backroom of its Waterbury store and failed to take appropriate remedial action in response. As noted, the record includes support for the propositions that the music was being played on a regular basis for, perhaps, a matter of months beginning when Sanders was promoted to the Receiver position in August of 2017, ECF No. 86 at 2; ECF No. 78-2 at 66, that Nunes worked in the area where the music was being played, Lockett Depo. at 146:23–147:7, and that Hill witnessed the music, Ex. L to Def.'s Mot. at 10. Nunes' affidavit, which disclaims knowledge of the placement of the "spook" sign and Hill's and Stevens' inappropriate language, noticeably does not disclaim knowledge of the backroom music. Rather, it states that Nunes did not address the manner in which employees listened to music until sometime during October of 2017, after Defendant initiated its investigation. Nunes Aff. ¶ 13. Accordingly, a reasonable jury could find that at least one of Plaintiff's supervisors "witnessed . . . conduct for 'months and months' and did nothing," *see Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019). Therefore, genuine issues of material fact remain with respect to whether,

at the very least, a failure to rectify the playing of racially offensive music in the backroom can be imputed to Defendant under a theory of negligence.

Based on the foregoing, the Court denies Defendant's motion insofar as it seeks summary judgment on Plaintiff's hostile work environment claim in Count One.

## V.    COUNT FOUR:   CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII

Turning next to Plaintiff's constructive discharge claim, the Court grants summary judgment in favor of Defendant.  Specifically, although Plaintiff's hostile work environment claim must proceed to a jury, the Court finds that Plaintiff has failed to set forth sufficient evidence to demonstrate that Defendant deliberately or intentionally created a work environment that was so intolerable that Plaintiff was forced to leave her employment with Defendant.

### A.  Legal Standard

A constructive discharge occurs where an employer, rather than discharging an employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003).  The Second Circuit has recognized two parts to this standard:   the "employer's intentional conduct" and the "intolerable level of the work conditions." *Petrosino*, 385 F.3d at 229.  Plaintiffs may establish their employers' intentional conduct through evidence that the employers "acted with the specific intent to prompt employees' resignations." *Id.*  Where a plaintiff cannot show such specific intent, however, the plaintiff "must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" *Id.* (cleaned up).  Moreover, it is not enough for a plaintiff to show "that the working conditions were merely difficult or unpleasant." *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013).  Rather, courts consider working conditions to be intolerable when, "viewed as a whole, they are 'so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Terry*, 336 F.3d at 152.  Finally, an employee "who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." *Id.*

      B. <u>Discussion</u>

Plaintiff has failed to demonstrate that she was constructively discharged from her employment with Defendant.  As a preliminary matter, in her opposition to Defendant's motion for summary judgment, Plaintiff does not respond to any of Defendant's specific arguments regarding her constructive discharge claim.  Rather, she cites generally to authorities setting forth the standard for proving that a party has perpetrated a fraud on the court.  Plaintiff provides no basis for a finding that Defendant has perpetrated a fraud on the Court and, as a result, the Court will address this argument no further.

Turning to the merits of her claim, the Court finds that Plaintiff has failed to demonstrate that Defendant intentionally created a hostile work environment that was so intolerable that she was forced to resign.  At the outset, the Court notes that much of the inappropriate conduct Plaintiff alleges, including the banana that was placed at the shared workstation where she was working and other conduct she experienced on her last day, occurred *after* she submitted her resignation on September 20, 2017.  The Court therefore cannot conclude that these incidents caused Plaintiff to resign weeks earlier.  Additionally, Plaintiff testified that, while she did not approve of the improper conduct of other employees, such conduct would not "guide [her] path," Lockett Depo. at 163:5–163:20, and that she resigned primarily because she was not promoted to the Receiver position, *id.* at 157:15–158:21; *see also* Def.'s L. R. 56(a)1 St. ¶ 27.  This testimony alone suggests that the conduct Plaintiff experienced was not so intolerable as to compel her to resign.

Moreover, Plaintiff has not adequately demonstrated that Defendant took any *deliberate* action that led to her resignation. *See Whidbee*, 223 F.3d at 74 (for constructive discharge claim, "something beyond mere negligence or ineffectiveness is required"); *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 94 n.17 (N.D.N.Y. 2013) (noting that "an employer must intentionally create intolerable working conditions for a constructive-discharge claim to lie" and that "[a]n employer's negligent failure to prevent or remedy co-worker harassment does not amount to deliberate action"). While, as discussed above with respect to Count One, genuine issues of material fact remain as to whether abusive conduct can be imputed to Defendant on a theory of negligence, Plaintiff has failed to provide any evidence that Defendant acted deliberately to create intolerable conditions or had any intent to cause her to resign. For example, even assuming that Hill was Plaintiff's supervisor, Plaintiff has failed to rebut Defendant's evidence that Hill's use of racially offensive language was a joke between her and Stevens, rather than a deliberate attempt to make Plaintiff's work environment intolerable. This, too, is fatal to her claim.

For the foregoing reasons, the Court grants summary judgment in favor of Defendant with respect to Count Four, Plaintiff's constructive discharge claim.

## VI.     COUNT FIVE:  DISCRIMINATION IN VIOLATION OF TITLE VII

The Court further finds that there are genuine issues of material fact that preclude judgment as a matter of law with respect to Plaintiff's discrimination claim. Accordingly, the Court denies Defendant's motion to the extent it seeks summary judgment on Count Five.

### A.    Legal Standard

Title VII prohibits employment discrimination based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The substantive standards that apply to employment discrimination claims brought under Title VII are well established. *Vivenzio v.*

*City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment" by an employer.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252 (1981).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination.  *See id.* at 252–53 (italicization added); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111–12 (2d Cir. 1988); *Gannon v. United Parcel Serv.*, 529 F. App'x 102, 103 (2d Cir. 2013) (summary order).  To make out a *prima facie* case of discrimination in violation of Title VII, a plaintiff must establish that:  "(1) [s]he is a member of a protected class; (2) [s]he performed the job satisfactorily or was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."  *Orlando v. Dep't of Transp., Comm'r*, 459 F. App'x 8, 9 (2d Cir. 2012) (summary order) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  The plaintiff's burden of establishing a *prima facie* case of discrimination is *de minimis*.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

Relevant here, an adverse employment action satisfying the third *prima facie* element "is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id.*  Denial of a promotion also constitutes a materially adverse action.  *See Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB) (MLO), 2010 WL 475203, at *4 (E.D.N.Y. Feb. 5, 2010); *see also Scé v. City of*

*New York*, No. 20-3954-CV, 2022 WL 598974, at *1 (2d Cir. Mar. 1, 2022) (summary order) (discussing discriminatory failure to promote claim under Title VII).

With respect to the fourth *prima facie* element, "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Rather, this element is a "flexible one that can be satisfied differently in differing factual scenarios." *Id.* Circumstances that could potentially give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface the plaintiff's name for positions for which he or she is well-qualified. *Id.* But, whatever the factual scenario, it is essential that a plaintiff "come forward with some evidence, beyond merely stating that [s]he is a member of a protected class who suffered an adverse employment decision." *James v. Mun. Credit Union*, No. 13CV4568-LTS-KNF, 2016 WL 698136, at *4 (S.D.N.Y. Feb. 19, 2016).

When a plaintiff establishes her *prima facie* case, she "creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254 (italicization added). The burden then shifts to the defendant to rebut the presumption of discrimination by "proffer[ing] a legitimate, non-discriminatory reason for its actions." *James*, 2016 WL 698136, at *3. If the employer articulates a legitimate, nondiscriminatory reason, then the plaintiff "is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation."

*Vivenzio*, 611 F.3d at 106.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  *Id.*

       B.  <u>Discussion</u>

With respect to Plaintiff's *prima facie* case of discrimination, Defendant does not dispute that Plaintiff is a member of a protected class, that she performed her job satisfactorily, or that she was qualified for the Receiver position she was denied.  Instead, Defendant disputes that Plaintiff suffered an adverse employment action and asserts that, even if Plaintiff has demonstrated that she suffered an adverse employment action, the action did not occur under circumstances giving rise to an inference of discrimination.  Defendant further asserts that it had a legitimate, non-discriminatory reason for not selecting Plaintiff for the Receiver position, and that Plaintiff cannot show that this reason was pretext.  The Court disagrees with Defendant and, therefore, denies Defendant's request for summary judgment on Count Five.

First, the Court finds that genuine issues of material fact remain as to whether Plaintiff suffered an adverse employment action.  At the outset, because Defendant is entitled to summary judgment on Plaintiff's claim for constructive discharge, Plaintiff's discrimination claim cannot proceed on the theory that her resignation constituted an adverse employment action.  It is well-settled, however, that the failure to promote an employee constitutes an adverse employment action.[7]  *See Scé*, 2022 WL 598974, at *1.  To establish her *prima facie* case for discriminatory failure to promote, Plaintiff must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was

---

[7] Defendant's briefing focuses exclusively on constructive discharge as the alleged adverse employment action, rather than failure to promote.  It is clear from Plaintiff's amended complaint, however, even without affording it the liberal construction owed to a filing by a self-represented litigant, that she is pursuing a failure to promote claim.  *See* Am. Compl. ¶¶ 21, 25, 31.  The Court therefore questions Defendant's failure to brief this issue.  In any event, Defendant conceded at oral argument that failure to promote constitutes an adverse employment action.

rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino*, 385 F.3d at 226 (internal quotation marks omitted). In addition, as in all Title VII cases, "there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009).

For purposes of Defendant's motion, the only element of Plaintiff's *prima facie* case for failure to promote that is seriously in dispute is whether Plaintiff was rejected for the Receiver position under circumstances giving rise to an inference of discrimination.[8] As noted, Defendant does not dispute that Plaintiff is a member of a protected class, that she was qualified for the Receiver position, and that Plaintiff was not promoted to the Receiver position, Def.'s L. R. 56(a)1 St. ¶ 24. Nor does Defendant brief the issue of whether the Receiver position remained open while Defendant continued to seek applicants with Plaintiff's qualifications. Defendant argues, however, that Plaintiff has failed to demonstrate that she was denied the Receiver position under circumstances giving rise to an inference of discrimination. The Court rejects this argument.

Courts in this Circuit have held that the selection of a less qualified, non-minority applicant to fill a position that a plaintiff was denied is sufficient to raise an inference of discrimination. *See Castillo v. Time Warner Cable of N.Y.C.*, No. 09 CIV. 7644 PAC, 2011 WL 3475419, at *6 (S.D.N.Y. Aug. 9, 2011) (denying defendant's request for summary judgment on failure to promote claim after finding that "the allegation that the position went to a less qualified

---

[8] Although Defendant's Local Rule 56(a)1 statement alleges that Plaintiff did not apply for the Receiver position, *see* Def.'s L. R. 56(a)1 St. ¶ 21, Defendant's motion does not expressly argue for dismissal of Plaintiff's Title VII discrimination claim on this ground. This is perhaps because Defendant's briefing does not characterize this case as one involving the failure to promote Plaintiff. At oral argument, however, Defendant conceded that neither Sanders nor Plaintiff was required to apply for the Receiver position in order to be considered for it, and Defendant did not assert that the absence of a formal application submitted by Plaintiff warrants judgment in Defendant's favor on this claim. Accordingly, the Court does not interpret Defendant's motion as seeking summary judgment on the ground that Plaintiff has failed to establish the second prong of her failure to promote claim.

nonminority technician is sufficient to establish an inference of discrimination"); *Aurelien*, 2009 WL 366148, at *7 (noting that, for purposes of examining a failure to promote claim at summary judgment, an inference of discrimination "may arise . . . if the position was filled by someone not a member of plaintiff's protected class"); *Valentin v. N.Y. State Dep't of Corr. Servs.*, No. 07-CV-7066 (CS), 2011 WL 13383232, at *7 (S.D.N.Y. Mar. 30, 2011) ("[T]he selection of a white male to fill the [position at issue] is sufficient to raise an inference of discrimination.").

Here, Plaintiff has submitted evidence indicating that Sanders was issued a notice of "corrective action" for "unacceptable conduct" that made him "ineligible for transfer or promotion" from May 26, 2017, through November 26, 2017.  ECF No. 86-3 at 2.  The parties agree, however, that Sanders was promoted to Receiver in or around August of 2017, during the period in which he was ineligible for promotion under the corrective action.  Def.'s L. R. 56(a)1 St. ¶ 9.  Plaintiff's conclusion that she was denied the promotion to Receiver because she is African American, and Sanders is Caucasian, thus rises above the level of mere speculation, despite Defendant's assertion to the contrary.  In light of this evidence indicating that Defendant selected an ineligible, non-minority candidate for the Receiver position Plaintiff sought, the Court finds that Plaintiff has raised genuine issues of material fact as to whether Defendant denied her the position under circumstances giving rise to an inference of discrimination.  The fact that there may be other possible reasons Sanders was promoted instead of Plaintiff also does not defeat an inference of discrimination; rather, the claim must survive summary judgment, and a jury must decide whether Plaintiff has sustained her burden of proving intentional discrimination.  *See Vivenzio*, 611 F.3d at 106 (noting that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff); *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) (holding that, under Title VII, a plaintiff

may succeed by establishing that a protected characteristic was a motivating factor for any employment practice, even though other factors also may have motivated the practice).

The Court is similarly unpersuaded by Defendant's argument that it is entitled to summary judgment on Count Five based on the "same actor inference."  That inference provides that a defendant "is entitled to an inference that 'discrimination was not a determining factor for [an] adverse action'" where the individual who hired the plaintiff is the same individual who takes the alleged adverse action.  *See Karim-Seidou v. Hosp. of St. Raphael*, No. 3:09 CV 51, 2012 WL 6628886, at *7 (D. Conn. Dec. 19, 2012) (citing, in part, *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *Villetti v. Guidepoint Glob. LLC*, No. 21-2059-CV, 2022 WL 2525662, at *4 (2d Cir. July 7, 2022) (applying same actor inference where same individual hired employee and then fired her six months later).  The same actor inference, however, "is just that, an inference," and it is not dispositive of Plaintiff's claims.  *Karim-Seidou*, 2012 WL 6628886, at *7.  Instead, the Second Circuit has made clear that "each case must involve an examination of all the circumstances."  *Grady*, 130 F.3d at 560.  As noted, Plaintiff has presented evidence that Defendant chose an ineligible, non-minority employee for the promotion.  Thus, drawing all inferences in favor of Plaintiff, the Court is unpersuaded that the same actor inference presents grounds for granting summary judgment in favor of Defendant in this case.

Based on the foregoing, the Court finds that Plaintiff has raised genuine issues of material fact as to whether she has demonstrated a *prima facie* case of discrimination in violation of Title VII.  These genuine issues of material fact preclude summary judgment in favor of Defendant at the *prima facie* stage of the Court's *McDonnell Douglas* analysis.  Such genuine issues of material fact do not, however, altogether preclude the Court from granting summary judgment in favor of Defendant.  Rather, if the Court assumes Plaintiff has established her *prima facie* case, the burden

then shifts to Defendant to articulate a legitimate, non-discriminatory reason for its failure to promote Plaintiff. If Defendant articulates a legitimate, non-discriminatory reason, the burden will then shift back to Plaintiff to show that Defendant's reasons were pretext. *See Vivenzio*, 611 F.3d at 106. Summary judgment thus may still be appropriate if Plaintiff cannot meet her resulting burden.

In this case, Defendant asserts that it promoted Sanders, rather than Plaintiff, to the Receiver position because Sanders was late or absent less frequently than Plaintiff, and because Sanders had prior receiving experience. ECF No. 78-1 at 26. In support, Defendant references Sanders' and Plaintiff's attendance records, as well as affidavits from Nunes and Sanders. *See id.* (citing Nunes Aff. ¶ 7 and Ex. G. to Def.'s Mot. ("Sanders Aff."), ECF No. 78-3, ¶ 5). These records suffice to show a legitimate, non-discriminatory reason for promoting Sanders rather than Plaintiff and, therefore, even assuming that Plaintiff has established her *prima facie* case, the burden would shift back to Plaintiff to show that Defendant's reason is pretext for discrimination.

The Court finds that Plaintiff has set forth sufficient evidence to raise genuine issues of material fact as to whether Defendant's proffered reason is pretext. As discussed, Plaintiff has submitted evidence that Sanders was ineligible for promotion at the time Defendant promoted him over Plaintiff. Defendant has submitted an affidavit from Nunes stating that, when he awarded Sanders the promotion, Nunes had not "review[ed] Mr. Sanders' personnel file, and was unaware, or forgot, he had a corrective action[] in his file." Nunes Aff. ¶ 8. Assessing Nunes' credibility with respect to this statement is a task for the jury at trial, not for the Court at summary judgment. *Kee*, 12 F.4th at 166 ("With respect to the evidence, at the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . for these are 'jury functions, not those of a judge.'" (quoting *Anderson*, 477 U.S. at 255)). In sum, the evidence

presented by Plaintiff is sufficient to allow a reasonable jury to find that Defendant's reason for promoting Sanders was pretext for racial discrimination against Plaintiff; therefore, summary judgment in Defendant's favor is unwarranted.[9]  *See Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009) ("An employment discrimination plaintiff may also demonstrate pretext by showing 'such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'").

In light of the foregoing, the Court finds that Defendant is not entitled to judgment as a matter of law with respect to Plaintiff's Title VII discrimination claim.  Accordingly, Defendant's motion is denied to the extent it seeks summary judgment on Count Five.

## VII.    COUNT THREE:  RETALIATION IN VIOLATION OF TITLE VII AND SECTION 1981

Finally, the Court grants summary judgment in favor of Defendant with respect to Count Three, Plaintiff's retaliation claim.  Defendant is entitled to judgment as a matter of law because Plaintiff has failed to demonstrate that she suffered an adverse employment action as a result of engaging in protected activity.[10]

---

[9] Plaintiff has also submitted an affidavit of another individual suggesting that Sanders could not have had receiving experience because his previous employer "does not and has never had Receiving."  Soberany Aff. ¶¶ 11–13.  At oral argument, Defendant disputed the materiality of the statement in the affidavit on the ground that the affiant and Sanders did not work for Sanders' former employer at the same time.  Because the Court finds that the promotion of an ineligible, non-minority applicant to the position Plaintiff sought is sufficient to raise genuine issues of material fact with respect to pretext, the Court will address this dispute no further.

[10] Defendant also claims that Plaintiff has failed to exhaust her administrative remedies with respect to this claim.  At the outset, the Court notes that "[t]he exhaustion requirement is relaxed under the 'reasonably related' doctrine if, among other things, the retaliation [the plaintiff] complains would have fallen within the scope of the investigation that would reasonably be expected to grow out of the charge in [her] administrative complaint."  *See Brown v. Cath. Charities of NYC/Beacon of Hope House*, No. 12-CV-05875 JG, 2013 WL 4544296, at *3 (E.D.N.Y. Aug. 28, 2013).  In any event, however, because the Court finds that Defendant is entitled to summary judgment on the merits of this claim, it need not address Defendant's failure to exhaust argument.  *See Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 385–86 (2d Cir. 2015) (discussing how the exhaustion requirement is not a jurisdictional requirement).

A.  <u>Legal Standard</u>

Title VII prohibits employers from retaliating against any employee because the employee has opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3(a); *see Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015); *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) (summary order).  Likewise, § 1981 "prohibits retaliation against an individual who has asserted rights protected by § 1981." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 3:04-CV-1707 (PCD), 2006 WL 2642415, at *22 (D. Conn. Sept. 13, 2006), *adhered to on reconsideration*, 2006 WL 8446750 (D. Conn. Nov. 6, 2006), *aff'd*, 282 F. App'x 930 (2d Cir. 2008).  Retaliation claims under Title VII and § 1981 "are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." *Littlejohn*, 795 F.3d at 315 (footnote omitted).  Under this framework, the plaintiff must first establish a *prima facie* case of retaliation by demonstrating:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  The plaintiff's burden in establishing her *prima facie* case is *de minimis*, and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164.

To establish an adverse action for purposes of a Title VII retaliation claim, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse," which, in this context, means that "it well might have dissuaded a reasonable worker from making

or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Title VII "does not set forth a general civility code for the American workplace," and "[p]etty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165 (internal quotation marks omitted). Therefore, Title VII protects only against retaliation "that produces an injury or harm." *Id.* In determining whether conduct amounts to an adverse employment action, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.*

If a plaintiff establishes that she has endured an adverse employment action, she must then establish the fourth element of her *prima facie* case, namely, a causal connection between her protected activity and the adverse employment action. Such proof of causation can be shown either: (1) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct"; or (2) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

If the plaintiff sustains the initial burden of establishing a *prima facie* case, "a presumption of retaliation arises." *Hicks*, 593 F.3d at 164. The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If the defendant does so, "the presumption of retaliation dissipates," *id.*, and the burden shifts back to the employee to "show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision," *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846

(2d Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 360 (2013)).  But-

for causation, however, "does not require proof that retaliation was the only cause of the

employer's action, but only that the adverse action would not have occurred in the absence of the

retaliatory motive."  *Id.*

      B.  <u>Discussion</u>

      Defendant does not dispute that Plaintiff participated in a protected activity or that

Defendant knew about that protected activity.  Rather, Defendant argues that Plaintiff has failed

to show that she experienced an adverse employment action and that there was a causal connection

between any adverse employment action and her protected activity.  The Court agrees with

Defendant and grants summary judgment on Count Three.

      Plaintiff alleges that Defendant retaliated against her by reducing her hours, Am. Compl. ¶

32, by creating a hostile work environment that led to her constructive discharge, *id.* ¶ 65, and

through other alleged retaliatory acts that occurred on her last day of employment for Defendant.

At the outset, to the extent Count Three rests on Plaintiff's claims that Defendant constructively

discharged her, the retaliation claim must fail for the reasons discussed above with respect to Count

Four.

      Plaintiff's claim that Defendant reduced her hours must also fail because Plaintiff has failed

to rebut Defendant's evidence that her hours were not, in fact, reduced after she engaged in

protected activity.  Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 17.  According to Plaintiff's testimony,

she engaged in protected activity in August of 2017, when she discussed her discontent about

Sanders being promoted to the Receiver position with Hill.  *See* Lockett Depo. at 71:14–73:7.

Plaintiff claims that Defendant retaliated against her after that date.  But she has failed to

adequately rebut Defendant's evidence that for the fifteen pay periods between December 31,

2016, and July 22, 2017, she averaged 41.60 hours per pay period, and that for the pay periods between July 29, 2017, and October 14, 2017, which include the dates after her protected activity, she averaged 45.9 hours per pay period. ECF No. 78-2 at 34–35. Instead, Plaintiff asserts that her shift documents could be "manipulated." Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶ 18. But Plaintiff points to only one alleged discrepancy between her working days and the pay records, *id.*, which, even if accepted as evidence of supposed manipulation, is insufficient to conclude that all of the shift documents showing an increase in hours after she complained to Hill were systematically manipulated. In sum, Plaintiff has failed to demonstrate a material reduction in her scheduled hours. Accordingly, any alleged reduction in hours cannot constitute an adverse employment action for purposes of Plaintiff's retaliation claim.

Plaintiff also claims that she was subjected to retaliatory conduct on her last day of employment because certain employees would not speak to her and because she witnessed Sanders express his anger about being accused of being racist. Pl.'s Resp. to Def.'s L. R. 56(a)1 St. ¶¶ 36–38. The Court agrees with Defendant however, that such alleged "general rude behavior" does not rise to the level of an adverse employment action, even when viewed in the aggregate. *See Oliver v. Waterbury Bd. of Educ.*, No. 3:12-CV-01285 VLB, 2014 WL 1246711, at *19 (D. Conn. Mar. 24, 2014) (noting that "general rude behavior or comments without more are insufficient to demonstrate retaliation"); *Arnold v. Yale New Haven Hosp.*, 213 F. Supp. 2d 142, 151 (D. Conn. 2002) (plaintiff's subjective feeling that she was receiving the "cold shoulder" was insufficient to constitute adverse employment action).

Finally, to the extent Plaintiff asserts that the hostile work environment she purportedly endured constitutes an adverse employment action for purposes of Count Three, she has failed to establish any causal connection between this adverse employment action and her protected

activity.   To establish a causal connection between a protected activity and a hostile work environment, "some increase in the discrimination or harassment—either a ratcheting up of the preexisting behavior, or new, additional forms of harassment—must occur." *Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 166 (E.D.N.Y. 2011).   Plaintiff claims that her first protected activity occurred in August of 2017, when she complained to Hill about Sanders' promotion to the Receiver position, days after Sanders was selected.   *See* Lockett Depo. at 72:1–74:16.   She also alleges, however, that offensive music was played in the backroom of Defendant's store beginning on the day Sanders was promoted to the Receiver position.   ECF No. 86 at 2.   Thus, by Plaintiff's own admission, the most significant factor contributing to her hostile work environment began before she engaged in her protected activity.

Moreover, Plaintiff has failed to provide a basis for the Court to conclude that she experienced significant new forms of harassment, or that harassment significantly increased, after her protected activity.   For instance, Plaintiff does not argue that the frequency of the backroom music playing increased after her conversation with Hill.   Even if the Court were to assume, however, that the harassment increased after Plaintiff's conversation with Hill (such as through the placement of the "spook" sign and banana in Plaintiff's workspace), Plaintiff has provided no evidence, aside from her own speculation, that such an increase was the result of her conversation with Hill.   Indeed, Defendant has submitted evidence, uncontroverted by Plaintiff, that the "spook" sign was in fact a joke between Hill and Stevens, rather than an incident of harassment directed at Plaintiff.   And Plaintiff has proffered no evidence about who might have placed the banana in her workspace, much less why it was placed there.   Therefore, to the extent Count Three relies on the hostile work environment Plaintiff purportedly endured, Plaintiff has failed to demonstrate a causal connection between the hostile work environment and her protected activity.   *See Bacchus v.*

*N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) (noting that, if the discrimination alleged with respect to a retaliatory hostile work environment claim "was just as bad before the employee complained as it was afterwards," then "the employee's complaints cannot be said to have led to that discriminatory behavior"); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Accordingly, because Plaintiff has not shown that she suffered any actual harm or injury as a result of her protected activity, Defendant is entitled to summary judgment with respect to Count Three.

## VIII.   CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Court will convene a conference with the parties to set a trial date with respect to Plaintiff's Title VII and § 1981 race-based hostile work environment claim (Count One) and her Title VII race discrimination claim (Count Five).

**SO ORDERED** at Hartford, Connecticut, this 22nd day of November, 2022.

  */s/ Sarala V. Nagala*  
SARALA V. NAGALA  
UNITED STATES DISTRICT JUDGE